## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

**UNITED STATES OF AMERICA** :
                                  :     **CRIMINAL INDICTMENT NO.**
     **v.**                        :     **1:15-CR-458-LMM/AJB**
                                    :
**MARK MORROW,** :
                                    :
         **Defendant.**           :

## UNITED STATES MAGISTRATE JUDGE'S
## FINAL REPORT AND RECOMMENDATION

Defendant Mark Morrow moves to suppress statements that the Government intends to introduce at his trial for wire and mail fraud, conspiracy to commit mail and wire fraud, and conspiracy to commit money laundering, on the ground that the uncounseled statements he gave on August 4, 2014, and November 10, 2015, were made in the context of plea negotiations and thus are not admissible under Federal Rule of Criminal Procedure 11(f) and Federal Rule of Evidence 410(a)(4). [Doc. 37]. The Court held an evidentiary hearing on the motion, [Doc. 43 (hereinafter "T_")], and the parties filed post-hearing briefs. [Docs. 49, 52 (Morrow), 51 (Govt.)]. For the following reasons, the Court **RECOMMENDS** that the motion, [Doc. 37], be **DENIED**.

AO 72A
(Rev.8/8
2)

*Facts*

As of June 2014, both the Securities and Exchange Commission ("SEC")[1] and the Federal Bureau of Investigation ("FBI") were conducting an investigation into Detroit Memorial Partners, a hedge fund that Morrow managed, and Summit Wealth Management, a hedge fund owned by co-defendant Angelo Alleca.  On June 2, 2014, Northern District of Georgia Assistant United States Attorney ("AUSA") Jeffrey Brown wrote a letter to Morrow addressed to Morrow's Ohio address, which provided in material part as follows:

Dear Mr. Morrow:

I am writing to advise you that you are the target of a federal criminal investigation involving a wire fraud scheme.

Ordinarily, your case would next proceed to a federal grand jury, where a prosecutor such as myself would present the evidence against you and ask that body to return an indictment naming you as a defendant.  If an indictment were returned, you would then be brought before a magistrate judge pursuant to an arrest warrant.  However, before presenting the Government's case to a grand jury and thereby locking in certain charges and allegations, I want to offer you and your attorney the opportunity to meet with the Government to discuss a possible resolution of your case.  Such early, negotiated settlements typically result in more favorable dispositions for defendants.

---

[1]     Morrow was deposed by the SEC on February 1, 2013.  [Doc. 49 at 1].  He was represented by counsel during that deposition.  T5.

2

If you have retained an attorney, you should feel free to have him or her contact me. If you feel that you cannot afford an attorney, you may contact the chambers of United States Magistrate Judge Linda T. Walker at 404-215-1370. If you explain that you received this target letter and ask to have an attorney appointed for you, one can typically be assigned at no cost if you qualify financially. If you seek to have an attorney appointed for you, please contact the judge's chambers no later than June 13, 2014.

If you wish to discuss resolution of this matter, please have your attorney contact me at (404) 581-6000, no later than June 23, 2014. I look forward to working with you to resolve this matter.

[Doc. 37-1]; *see also* T8, Govt. Exh. B. Morrow acknowledged receiving the target letter. T12-13. In this case, Morrow was not sent a "proffer" letter. T11.[2]

After Morrow received the letter, Morrow and Brown engaged in a series of email exchanges attempting to set up a time convenient for Morrow, Brown, and FBI Special Agent William Share to meet in Atlanta, which meeting finally was

---

[2]    Morrow represents that the Government's typical proffer letter contains the following language:

In agreeing to provide a proffer to the government, your client agrees that the use of any statement or information provided by your client shall be governed by the terms and conditions set forth in this letter agreement. Furthermore, your client waives any right to challenge the admissibility of any such statements or information under Fed. R. Crim. P. 11 and Fed. R. Evid. 410.

[Doc. 49-1 at 3].

3

scheduled for August 4, 2014.  T5, 10, 13, 14; Def. Exh. 2.  Morrow traveled from his home in Ohio and appeared at the meeting without a lawyer.  T10, 13.  Share described Morrow's demeanor at the session as professional, cooperative, and polite.  T6, 10; Govt. Exh. A at 8.

At the beginning of the interview, Morrow was asked whether he was represented by counsel.  He stated that he was not and that he was willing to proceed with the interview without a lawyer being present.  T8; Govt. Exh. A at 1.  Brown and Share went over the target letter with him.  T8, 13.

There were no discussions during the ensuing interview of a plea or plea bargain, nor was there any discussion of any charges that Morrow would face during, before, or after the interview.  T9.  Similarly, they did not discuss Morrow's cooperating against Alleca in exchange for a reduced charge, nor were there any conversations about any promises of leniency in order to obtain his cooperation.  T9-10.  Also, there were no promises of leniency or discussion of a plea bargain in the email communications leading up to the August 4 interview.  T10.  The first interview ended when Brown and Share asked Morrow if he would be available to speak with them again.  T10; Govt. Exh. A at 8.

4

In November 2015, FBI Special Agent Oliver Rich telephonically contacted Morrow about being interviewed again.  T16.  During that telephone contact, Rich did not make any promises to Morrow, nor did he have any substantive conversations.  T16-17.  He did not mention or discuss the June 2, 2014, target letter to Morrow.  T26-27.  This followup interview was sought because the Government had not evaluated all of the evidence at the time of the initial interview and had additional questions for Morrow.  T21.  Morrow appeared on November 10, 2015, at the U.S. Attorney's Office in Atlanta, where he was interviewed by Rich and Brown.  T17.  They conveyed to Morrow that they had more questions as a followup to the earlier session.  Govt. Exh. C at 2.

The interview was audio-recorded.  T17.  The session began with Rich asking Morrow if he was represented and Morrow responded that he was not.   T17; Govt. Exh. C at 2.  Rich advised Morrow that he had a right to have an attorney present and that the interview was voluntary in that he could stop it at any time, and Morrow stated that he understood.  *Id.*  Rich did not show him the target letter, nor was it mentioned.   T17, 26-27.   He described Morrow's demeanor as "a little bit nervous."  T18.  However, the interview was conducted in a "low-key" manner.  T22.

During this session, there were no discussions about plea agreements, charges

5

Morrow would face, potential leniency, or his cooperation against Alecca.   T22.
Morrow did not ask about charges or discuss pleading guilty.   T23.   Brown and Rich
asked Morrow to explain certain transactions based on documents that they possessed,
and Morrow cooperated in answering their questions.   T27-28.   He was not told that he
was going to be charged or indicted.   T29.   Morrow made no confessions of guilt during
the interview, instead more frequently stating that he did not know of certain events or
details and contending that he lacked knowledge of Alleca's actions.
T31; Govt. Exh. C at 9, 10, 14, 17, 28, 166-67, 181, 272, 290, 344.   Towards the
conclusion of the interview, the following colloquy occurred:

> AUSA BROWN:   All right. Well, do you have anything else, Agent
> Rich?
>
> S.A. RICH:   No.  I was going to give you my card in case you
> think of something or if you want to send any
> additional stuff in.  My e-mail address is on there.
> You can e-mail it to me or you can mail it in, so if you
> find -- you know, when you go back, I'm sure you're
> going to be thinking about this.  If you find something
> that's, you know, helpful to what you've told us
> today, that helps to clear up some of the things that
> we've talked about, then give me a call or send me an
> e-mail or, you know, just let me know.
>
> MR. MORROW:   What's the next step?

AUSA BROWN:     The next step here is for us -- we still have some work to do. We still have some, you know, some additional accounts that we don't know. The next step is just, you know, following the evidence and seeing where it leads us. So I don't want you to feel like -- I think Agent Rich did a good job of telling you, don't go out and do anything rash. I know you made some, you know, in your anger, you made some comments about Alleca. You know, please don't do anything. This has gone on this far. This all happened in 2012. Here we are in 2015. There's no need to do anything rash. There really isn't. This is not the end of the world. We're just investigating the case to try to find where the money went and follow these transfers of the money, so.

MR. MORROW:     You're a nice guy. You're good guys. . . .

AUSA BROWN:     I'm not -- we're not trying to -- yeah.

MR. MORROW:     No, I -- I know this is bad. But --

AUSA BROWN:     Listen, we know you're going to be -- we can see you're upset. Do not do anything rash. This is not the end of the world, okay. If you have any questions about the investigation, call Agent Rich. Okay? I mean we're serious.

MR. MORROW:     All right.

AUSA BROWN:     This is -- any questions, any concerns, call Agent Rich.

S.A. RICH:     Do you have any questions now?

7

MR. MORROW:    No.

S.A. RICH:    This is not the end of the world, okay. So I know it's shocking, like you said, but it's -- I tell people, it's going to be all right.

AUSA BROWN:    Like I said, you're always free to go. I think we're done here unless you have any questions for us.

MR. MORROW:    No.

AUSA BROWN:    I think Agent Rich can show you out. I want to shake your hand and thank you for coming.

MR. MORROW:    Thank you. Thanks.

S.A. RICH:    Is there anything else? Did you bring anything in?

MR. MORROW:    No. No, I just came.

S.A. RICH:    Fair enough. Go down this way.

Govt. Exh. C at 362-64. At some point after this interview, Morrow contacted Rich about providing him additional materials, and when Morrow went to deliver the documents (to agents in Ohio), he was arrested and then elected not to produce any more documents. T25, 29, 32.

### Arguments of the Parties

Morrow argues that the August 2014 and November 2015 statements must be suppressed pursuant to Fed. R. Crim. P. 11(f) and Fed. R. Evid. 410(a)(4) because they

8

were statements made during plea discussions and, as a result, these rules mandate that the statements be excluded at his trial. [Doc. 49 at 2]. In support, he contends that Brown's June 2, 2014, letter to Morrow offered Morrow an opportunity to meet with the Government prior to indictment to discuss a possible resolution. [*Id.* at 2 (quoting Govt. Exh. A at 1)]. He points out that he traveled to at his own expense from Ohio to Atlanta to attend the meeting; that once there, Share showed Morrow the target letter and confirmed that Morrow did not want to have appointed counsel; and then Brown and Share started asking Morrow questions. At the end of the interview, Morrow agreed to speak with them again if they had additional questions. [*Id.* (citations omitted)]. Then, on November 10, 2015, after Rich called him and asked if he would come to talk with them about the case, Morrow again traveled to Atlanta and met with Brown and Rich. At the beginning of the session, Rich told him that they wanted to " 'review some of the stuff that you already said.' " [*Id.* at 4 (quoting Govt. Exh. C at 2)]. He argues that at no time before or during the November 2015 interview did either Brown or Rich revoke the target letter or state that it no longer spelled out the terms of the meeting. [*Id.* (citing T26-27)].

Morrow then argues that pursuant to Rule 410(a)(4) of the Federal Rules of Evidence, a court cannot admit against a defendant " 'a statement made during plea

9

discussions with an attorney for the prosecuting authority if the discussions did not result in a guilty plea or they resulted in a later-withdrawn guilty plea,' " and since the two interviews were conducted pursuant to the June 2014 letter and were made in the course of plea negotiations, his statements are inadmissible. [*Id.* at 5 (quoting Fed. R. Evid. 410(a)(4))]. He further contends that once he asserts that a statement was made in the course of plea negotiations, the burden shifts to the Government to establish by a preponderance of the evidence that the discussion was not a plea negotiation. [*Id.* at 5 (citing *United States v. Robertson*, 582 F.2d 1356, 1366 n.21 (5th Cir. 1978) (en banc)[3]; *United States v. Washington*, 614 F. Supp. 144, 148 (E.D. Pa. 1985))]. He submits that under *Robertson*, the Court must determine (1) whether the accused exhibited an actual subjective expectation to negotiate a plea at the time of the discussion(s) and (2) whether the accused's expectation was reasonable given the totality of the objective circumstances. [*Id.* at 5-6 (quoting *Robertson*, 582 F.2d at 1366)]. He argues that it does not matter that Morrow was not represented, citing the advisory committee notes to the 1979 amendments to Rule 11 of the Federal Rules of Criminal Procedure. [*Id.* at 6]. He also argues that whether the

---

[3]        Decisions of the Fifth Circuit rendered on or before September 30, 1981, are binding precedent in the Eleventh Circuit. *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

10

discussion occurred before or after indictment is irrelevant.  [*Id.* (citing *United States v. Boltz*, 663 F. Supp. 956, 961 (D. Alaska 1987))].

He next argues that he satisfied *Robertson*'s first prong as to the August 4, 2014, statement because there is no doubt that it was made as a part of plea negotiations, since it occurred after Brown sent him the target letter, which invited him to meet with him to " 'discuss a possible resolution of your case' " in the hopes of reaching a " 'negotiated settlement,' " that " 'typically result[s] in a more favorable disposition for defendants.' "  [*Id.* at 6-7 (quoting Govt. Exh. A at 1)].  He further argues that once he arrived at the interview, the letter was presented to him, and thus he contends that by going over the terms of the letter, Brown made it clear that the intended nature and scope of the meeting was plea negotiations.  [*Id.* at 7].  He contrasts the letter presented to him in his case to what he describes as the typical proffer letter presented by the Government in this District to putative and actual defendants, where the defendant agrees to waive any challenge to his statements under Fed. R. Crim. P. 11 and Fed. R. Evid. 410.  [*Id.* at 7-8 (quoting [Doc. 49-1 at 3])].  He thus argues that the explicit language of the target letter combined with his traveling to Atlanta at his own expense to meet with Brown and Share demonstrates his subjective expectation to negotiate a plea on August 4, 2014, noting that he "did not simply walk into the

11

AUSA's office and 'spill the beans,' " [*id.* at 8 (quoting *Washington*, 614 F. Supp. at 149) (quotation marks altered)], but rather came to Atlanta after being invited to a meeting that had a stated purpose of plea negotiations.  [*Id.*].

Morrow further argues that he satisfied the second *Robertson* prong because his subjective expectation was objectively reasonable.  He contends that a reasonable person would have considered the purpose of the meeting to be to resolve the case based on the target letter's language.  In support, he points out that he was not told that the purpose of the meeting had changed into an "unprotected interrogation." [*Id.* at 9]. He submits that it does not matter that at the meeting the parties did not discuss charges, cooperation, or promises of leniency, [*id.* at 9 (citing *United States v. Stein*, No. CR. 04-269-9, 2005 WL 1377851 (E.D. Pa. June 8, 2005)], because the statements were made at effectively a proffer session related to plea negotiation.  [*Id.* (citing *United States v. Velez*, 354 F.3d 190, 194 (2d Cir. 2004))].  Thus, he argues, a meeting with the prosecutor to see if the defendant had enough information to interest the government in starting plea negotiations, or to convince the government to abandon its case against the defendant, is part of plea negotiations covered by Rule 410.  [*Id.* at 9-10 (citing and quoting *United States v. Ross*, 588 F. Supp. 2d 777, 783 (E.D. Mich. 2008) (describing such discussions as plea negotiations "albeit, perhaps

12

only in their nascent stages" and observing that "[a]dmissions, concessions, revelations, or confessions made by a defendant (or putative defendant) during such a conference fairly are characterized as 'statements made in the course of plea discussions.' ")].

Morrow particularly relies on *Stein*. In that case, the defendant refused to sign a proffer letter when he met with the AUSA and the agents to give a proffer in the hope of reaching a cooperation agreement. The defense lawyer described the meetings as the first step in the process of getting a plea agreement, but no plea terms were discussed. Nonetheless, the *Stein* court found that the proffers were part of plea negotiations and rejected the Government's argument that the meetings were not plea negotiations because terms were not discussed, reasoning that the text of the rules does not require such express discussion and the advisory committee notes provide that the rules cover preliminary statements to the prosecuting attorney with an eye toward reaching an agreement. [*Id.* at 10 (quoting *Stein*, 2005 WL 1377851 at *12)]. He also cites to *Stein*'s reasoning that since a plea deal typically gets worked out over several conversations, whether the conversations are " 'temporally separated or not, they are as a practical matter all part of the discussions over a defendant's plea and should be protected under FRE 410 and FRCrP 11(f).' " [*Id.* at 11 (quoting *Stein*, 2005 WL 1377851 at *13)]. Morrow also argues that the fact that during the prefatory

13

discussions with Brown and Share the word "plea" was not mentioned is not conclusive, since, he contends, if such words were necessary to a finding that the statements were protected, "a savvy defendant could turn any meeting with a government prosecutor into plea negotiations simply by saying a magic word." [*Id.*].

Morrow next claims that the November 10, 2015, statement also should be suppressed from his trial because this meeting was merely a continuation of the plea discussions that began in August 2014. He contends that, based on the target letter, he believed that he was engaging in plea negotiations with the Government and that was the reason AUSA Brown was present. He further submits that the target letter was not retracted and at no time did Brown tell him that the terms of the meeting had changed. [*Id.* at 11-12]. He also argues that it was significant that on this later occasion the AUSA also was present, contending that perhaps if the meeting had been only with a law enforcement agent, he then would have been on notice that the meeting was something other than an effort to negotiate a plea. Instead, he claims, it was reasonable for him to believe that after hearing his version of events during the August 2014 session, the Government would want to meet with him again to attempt to resolve this case. [*Id.* at 12].

14

In opposition to Morrow's arguments, the Government argues that Morrow did not satisfy the test set out in *Robertson* that he had an actual subjective expectation to negotiate a plea and in any event, even if he had subjective expectations, his expectations were not reasonable under the totality of the objective circumstances. [Doc. 51 at 6]. Thus, the Government contends, like the defendant in *Hogan v. United States*, 550 Fed. Appx. 756, 759 (11th Cir. Dec. 19, 2013), Morrow did not express a desire to or exhibit an intention to plead guilty, but rather stated that he did not commit any crime and lacked knowledge of Alleca's activities. [*Id.* at 6-7 (citing T9-10, 23, Govt. Exh. C at 7, 166-67, 181, 290)]. The Government also argues that when he became emotional at the end of the November interview, he did not offer to plead guilty. [*Id.* at 7 (citations omitted)].

The Government next argues that the mere fact that someone cooperates with the authorities does not mean that person is intending to negotiate a guilty plea, pointing out that in *Robertson*, the cooperation was motivated by a desire to protect the defendants' spouses. [*Id.* (citing *Robertson*, 582 F.2d at 1369)]. The Government contends that in the present case, Morrow was motivated not by a desire to plead guilty but rather to cast blame on Alecca. [*Id.*].

15

As for the reasonableness of any subjective expectations, the Government argues that courts have held that such subjective expectations are unreasonable where the Government does not make any firm offers or specific promises. [*Id.* at 8 (citing *Hogan*, 550 Fed. Appx. at 759)]. It also argues that even having general discussions about leniency has been found not to render subjective expectations reasonable. [*Id.* (citing *United States v. Merrill*, 685 F.3d 1002, 1013 (11th Cir. 2012))].

It also submits that, like the defendants in *Hogan* and *Merrill*, Morrow's subjective expectation was unreasonable because there were no charges against him, he voluntarily participated in the interview, he was free to terminate the interview and consult a lawyer, and the Government did not make any promises nor extend a firm plea offer to him. Specifically, the Government contends that the target letter alluded only generally to a possible resolution and to how negotiated settlements typically result in more favorable dispositions, but, just like in the subsequent interviews, it made no specific promises, nor did it extend any offers, firm or otherwise, to Morrow. [*Id.* at 8-9].

The Government further argues that the target letter and Morrow's traveling to meet with Brown and the agents do not demonstrate a subjective expectation to negotiate a plea. It asserts that Morrow's reliance upon *Stein* and his attempt to

16

categorize his interviews as proffer sessions as in *Stein* are misplaced because, first, *Stein* rejected the *Robertson* test, which is binding in this Circuit, and second, because *Stein* involved expressed "off-the-record" statements in formal proffer sessions where defense counsel raised the issue of a departure under U.S.S.G. § 5K1.1 in exchange for the defendant's cooperation.  [*Id.* at 10 (citing *Stein*, 2005 WL 1377851 at *14)].  Here, the Government argues, there was no evidence that Morrow's statements were intended to be off-the-record or that they were subject to a proffer letter, nor was there any discussion of cooperation, the Sentencing Guidelines or their application, or the like, that would suggest that Morrow's statements were made in anticipation of a future benefit.  [*Id.*].

In reply, Morrow argues that the flaw in the Government's argument is its disregarding of the express language of the target letter that invited him to meet in an effort to resolve the case, meetings that he claims never would have occurred in absence of the letter.  [Doc. 52 at 1-2].  He points out that at the beginning of the August 2014 meeting, Morrow was shown the target letter and was asked whether he received it and understood it.  [*Id.* at 2].  He thus submits that the letter framed his understanding and expectation of the purpose of that encounter and that the Government's ignoring of

17

such a critical piece of evidence is not a valid analysis of the totality of the circumstances.  [*Id.* (citation omitted)].

Morrow argues that like *SEC v. Johnson*, 534 F. Supp. 2d 63 (D.D.C. 2008), the target letter is an important part of the circumstances.  There, the prosecutor contacted defense counsel prior to indictment to initiate plea negotiations.  The defendant was required to talk with prosecutors pursuant to a proffer letter.  After the second debriefing, the prosecutor made a plea offer that was rejected.  The *Johnson* court found that the defendant's statements could not be used against him in a related SEC civil enforcement action because the prosecutor had contacted defense counsel with the expressed purpose of trying to negotiate a plea pursuant to the proffer letter, the latter which is evidence of plea negotiations.  [*Id.* at 3 (citations omitted)].  Morrow submits that like the proffer letters in *Johnson* and *United States v. Wood*, 879 F.2d 927, 936 (D.C. Cir. 1989), the target letter here set the ground rules for the discussion at the first meeting that the purpose of the meeting was to negotiate a plea.  [*Id.* at 3-4].  He argues that the fact that a plea was not discussed at the meeting does not resolve the issue because the language of the target letter and Morrow's travel to Atlanta to meet with the prosecutor demonstrates an intention to negotiate a resolution.  [*Id.* at 4].  Morrow contends that the Government's turning the session into an interrogation was akin to

18

a "bait-and-switch" and posits that the Government had the obligation to advise him that the target letter was no longer valid and that the purpose of the meeting was an interrogation.  [*Id.* at 4].  He argues that the Government cannot now claim that his reliance on the AUSA's written representations was unreasonable.  He further submits that, as a businessman, Morrow appreciated that negotiations are a process that involve many discussions over time and that it was reasonable for him to conclude that these meetings were the "first steps in a negotiating dance that would ultimately lead to a resolution."  [*Id.* at 5].

### *Discussion*

Federal Rule of Criminal Procedure 11(f) provides that "[t]he admissibility or inadmissibility of a plea, a plea discussion, and any related statement is governed by Federal Rule of Evidence 410."  In turn, Federal Rule of Evidence 410 provides, in pertinent part, as follows:

> (a) Prohibited Uses.  In a civil or criminal case, evidence of the following is not admissible against the defendant who made the plea or participated in the plea discussions:
>
> > (1) a guilty plea that was later withdrawn;
> >
> > (2) a nolo contendere plea;

19

(3) a statement made during a proceeding on either of those pleas under Federal Rule of Criminal Procedure 11 or a comparable state procedure; or

(4) a statement made during plea discussions with an attorney for the prosecuting authority if the discussions did not result in a guilty plea or they resulted in a later-withdrawn guilty plea.

The parties are in agreement that Rule 410(a)(4) and *Robertson* provide the framework for the Court's recommended resolution.[4]  The Government bears the burden of proving that the discussions were not plea negotiations.  *Robertson*, 582 F.2d at 1366, n.21.[5]

---

[4]      The 1979 amendments to Fed. R. Evid. 410 and Fed. R. Crim. P. 11(e)(6) [subsequently re-lettered to 11(f)] made inadmissible statements made in relation to plea discussions with the attorney for the government or the prosecuting authority, clarifying that no *per se* exclusion occurs when the discussion is with law enforcement agents only.  Fed. R. Crim P. 11, Advisory Committee Note, rule 11(e)(6), 1979 Amendments; Fed. R. Evid. 401, Advisory Committee Note, 1979 Amendments.

[5]      Although *Robertson* did not explicitly decide what standard of proof the Government needed to satisfy in order to meet its burden, it cited to the holding in *Lego v. Twomey*, 404 U.S. 770 (1972), that voluntariness of a confession need only be proven by a preponderance of the evidence.  *Robertson*, 582 F.2d at 1366 n.21.  The Supreme Court has subsequently reaffirmed the preponderance standard as the appropriate quantum of proof on issues seeking to suppress evidence from a criminal trial.  *Colorado v. Connelly*, 479 U.S. 157, 168 (1986); *Nix. v. Williams*, 461 U.S. 431, 444 n.5 (1984); *United States v. Matlock*, 415 U.S. 164, 178, n.14 (1974) ("[T]he controlling burden of proof at suppression hearings should impose no greater burden than proof by a preponderance of the evidence").  As a result, the Government must prove by a preponderance of the evidence that the discussions were not plea negotiations.

20

In *Robertson*, Robertson and Butigan were arrested by DEA agents following execution of a search warrant at a meth lab.  Robertson's girlfriend and Butigan's wife also were arrested.  The four arrestees were *Mirandized* and transported to the DEA office.  In the parking lot of that office Butigan essentially told the transporting agent that he was willing to tell the agents everything if it would get his wife off, and the agent replied that, although he could not make him any promises, cooperation would likely help him out in the future.  Butigan also asked to speak with Robertson, and afterwards they both stated that they were willing to talk in the hopes for leniency for the two women.   In the ensuing interview, both Robertson and Butigan absolved the women of any involvement and implicated themselves.  *Robertson*, 582 F.3d at 1360-61.  Robertson's statements were introduced against him at his trial,[6] and for the first time on appeal, he claimed that the statements were inadmissible under Rule 410.  *Id.* at 1363.

In concluding that Robertson's statements were properly admitted, the *Robertson* court first recognized that although plea negotiations are inadmissible, not every discussion between the accused and the Government is a plea

_____

[6]      Butigan pleaded guilty, *Robertson*, 582 F.2d at 1360 n.6, and the two women were not charged.  *Id.* at 1370.

21

negotiation.  *Id.* at 1365.  The court concluded that suppressing evidence of such negotiations serves the policy of insuring a free dialogue between the accused and the Government, but only when the accused and the Government actually engage in plea negotiations, which the *Robertson* court defined as

> "discussions in advance of the time for pleading with a view to an agreement whereby the defendant will enter a plea in the hope of receiving certain charge or sentence concessions." . . . Thus, plea negotiations contemplate a bargaining process, a "mutuality of advantage," . . . and a mutuality of disadvantage.  That is, the government and the accused both seek a concession for a concession, a Quid pro quo.  The accused contemplates entering a plea to obtain a concession from the government.  The government contemplates making some concession to obtain the accused's plea.

*Id.* at 1365-66 (internal and ending citations omitted).

In determining whether a discussion is characterized as an inadmissible plea negotiation, *Robertson* directs courts to carefully consider the totality of the circumstances with each case turning on its facts, keeping in focus the purpose of encouraging and protecting a free plea dialogue between the accused and the Government.  *Id.* at 1366.  The court noted that given this purpose, the initial inquiry must focus on the accused's perceptions of the discussion, in context.  *Robertson* cautioned, however, that in considering the accused's subjective perception, his subsequent account of his prior mental impression is not to be given sole determinative

weight, or else every confession would be subject to challenge.   Instead, a court confronting the issue must apply a two-tiered analysis and consider, first, whether the accused exhibited an actual subjective expectation to negotiate a plea at the time of the discussion, and, second, whether the accused's expectation was reasonable given the totality of the objective circumstances.  *Id.*

The *Robertson* court further observed that in considering the accused's subjective state of mind, care must be exercised to distinguish where the accused was simply making admissions and where he was seeking to negotiate a plea, and thus, the court must take into account the tenor of the discussion.  *Robertson* points out, for example, that if the accused unilaterally offers to plead guilty or take the blame in exchange for a government concession, then the policy under the rules favoring suppression is supported.   While a " 'preamble explicitly demarcating the beginning of plea discussions' " is not necessary, *id.* at 1367 (citation omitted), where, as the *Robertson* court described the facts in that case, "the record does not disclose a clear expression of a subjective intent on the part of the accused to pursue plea negotiations, the accused's after the fact expressions of his intent must be more carefully evaluated," and the court "must focus searchingly on the record to determine whether the accused reasonably had such a subjective intent, examining all of the objective circumstances,"

23

and thus the "objective record must establish that the accused's statements were made in a reasonable belief that he was negotiating a plea agreement," *id.* at 1367.

The *Robertson* court concluded, therefore, that Robertson and Butigan were not negotiating a plea in the parking lot, but rather the quid pro quo was a confession in exchange for the women's release. The court reiterated that the cooperation of an arrested person often prompted by a desire for leniency for himself or others does not constitute plea negotiations, and a bargained confession, without more, is not a plea negotiation. *Id.* at 1368-69. Noting that neither Robertson or Butigan expressly offered to plead guilty in exchange for a government concession, the court had to look at the record to see if Robertson reasonably had such an intent, and concluded that he (and Butigan) were only concerned with the release of the women: "This, then, was the only purpose of the parking lot conversation: they admitted their own complicity in order to exonerate the women. They did not offer to plead guilty. They did not even contemplate pleading guilty." *Id.* at 1369-70. Because there was no evidence in the record that they were willing to plead guilty to exonerate the women, the *Robertson* court concluded that there was no evidence that they were negotiating a guilty plea, and thus, Robertson's statements were not subject to suppression. *Id.* at 1370-71.

24

In evaluating whether an accused's discussions with the Government amounted to plea negotiations, the Former Fifth and Eleventh Circuits consistently look to see whether the discussions contemplated an accused's entering a plea to obtain some concession from the Government and the Government contemplates making some concession to obtain the accused's plea.   Thus, in *United States v. Ross*, 493 F.2d 771, 774-75 (5th Cir. 1974), the court held that the husband's statements that he would "take the blame" if his wife were released was held to be part of plea negotiations.   In contrast, in *United States v. Geders*, 585 F.2d 1303, 1305 (5th Cir. 1978) (en banc), the defendant testified in response to the question, "Were you going to plead guilty?" that "[h]e (the agent) mentioned something about pleading and I said that I didn't want to because I felt I was innocent of the charge in my case.   I would work out and cooperate but not by pleading guilty."   The *Geders* court concluded that applying the *Robertson* standard to the objective circumstances disclosed by this record, "it is patent that Geders could have had no reasonable subjective expectation that plea negotiations were in progress." *Id.* Therefore, his statements were deemed properly admitted.

Further, in *United States v. Cross*, 638 F.2d 1375, 1378 (5th Cir. Unit A Mar. 13, 1981), the defendant's statements expressing willingness to

AO 72A
(Rev.8/8
2)

help the FBI in an investigation unrelated to the charge for which he was arrested, in exchange for leniency, were found to be admissible because they did not demonstrate a contemplation to enter a guilty plea to the changes on which he was held or any other charges.  In *United States v. Deal*, 438 Fed. Appx. 807, 811 (11th Cir. Aug. 18, 2011), the Eleventh Circuit concluded that the defendant's statements of contrition, coupled with the denial of guilt, were plainly not made "with a view toward negotiating a plea agreement," (quoting *Robertson*, 582 F.2d at 1368).

The Circuit's next treatment of this issue was in *United States v. Merrill*, 685 F.3d 1002 (11th Cir. 2012).  There, Merrill was served with a subpoena to testify before a grand jury investigating whether a company in which he was invested and heavily involved in its operations had unlawfully sold ammunition from a prohibited source to the Government.  In preparation for his testimony he voluntarily met with the AUSA and law enforcement agents.  When the interview became accusatory, he was advised that he had the right to leave, to obtain counsel, or to stay and discuss certain emails he was being confronted with.  Further, he was told he could face charges.  He also was told that if he cooperated, the Government could ask for a reduction in his sentence and if he pleaded guilty, the Government would recommend leniency, but the discussions about leniency were general in nature.  He stayed and made incriminating

26

statements.  *Id.* at 1007-08.  The *Merrill* court held that these statements were not subject to suppression under Rule 410 or Rule 11(f), because even if Merrill had a subjective expectation to negotiate a plea, the expectation was unreasonable since there were no charges pending against him, he was told he was free to stop the interview and obtain a lawyer and he declined to do so, and any statements about leniency were general in nature.  *Id.* at 1013 (citing *United States v. Posey*, 611 F.2d 1389, 1390-91 (5th Cir. 1980) (The "statement that [the agent] would bring [the defendant]'s cooperation to the attention of the prosecutor and the court did not give [the defendant] a reasonable expectation that he was negotiating a bargain.  Rather it is the antithesis of a bargained plea.")).[7]

Finally, in *Hogan*, 550 Fed. Appx. at 759, the Eleventh Circuit rejected the defendant's contention that his statements were excludable under Rule 410 and Rule 11(f), holding that his own statements reflected that he never expressed a desire

---

[7]     Although not binding precedent, cases from the Eighth Circuit are consistent with the Eleventh Circuit's cases.  *See United States v. Edelmann*, 458 F.3d 791, 804-06 (8th Cir. 2006) (holding Rule 410 inapplicable to statements made during preindictment meetings by defendant seeking to avoid indictment and not reaching plea agreement); *United States v. Hare*, 49 F.3d 447, 450 (8th Cir. 1995) (voluntary statements made in hope of improving situation before plea negotiation has begun or after plea agreement is reached are not statements made "in the course of plea discussions" protected by Rule 410).

to plead guilty, "which demonstrates that he did not have a subjective expectation to negotiate a plea at the debriefing." *Id.* (citing *Merrill*, 685 F.3d at 1013). The *Hogan* court also held that, even if Hogan had the subjective expectation to negotiate a plea, the subjective expectation was not reasonable because he voluntarily participated in the debriefing and understood that he was not being promised any benefit for his cooperation and there was no firm plea offer from the Government. *Id.*

Applying this binding precedent, the Court concludes that the Government has satisfied its burden that Morrow's statements on August 4, 2014, and November 10, 2015, are not protected under Rule 11(f) and Rule 410. First, Morrow did not have a subjective expectation that he was engaging in plea negotiations. Morrow argues that the target letter establishes that he had such a subjective expectation, but the target letter more accurately reflects the *Government's* subjective expectation that at least the initial meeting could provide Morrow the opportunity to discuss a negotiated plea. However, like the defendants in *Geders*, *Deal*, and *Hogan*, Morrow never expressed a willingness to plead guilty or mutually bargain for concessions with the Government. Nothing that was discussed in either the August 2014 or November 2015 sessions reflected a "free plea dialogue between" Morrow and the Government. *Robertson*, 582 F.2d at 1366. There was no discussion

28

at either meeting of potential charges, cooperation, or reduction of sentence for cooperation. Instead, Morrow's statements were intended to showcase to the Government both his lack of involvement with, and absence of criminal intent, in the acts committed by Alleca. *See* T9-10, 23; Govt Exh. A at 4-8; Govt. Exh. C at 7, 166-67, 181, 290. As such they were more akin to the statements found admissible in *Hogan*, *Edelmann*, and *Hare*. The target letter did not amount to a "bait and switch," as alleged by Morrow, but instead invited Morrow to discuss a plea. He did not indicate his willingness to begin plea negotiations, however, because he denied any culpability.

The cases primarily relied upon by Morrow do not counsel a contrary result. *Stein* is inapposite both legally, because that decision expressly rejected the test enunciated in *Robertson*, which case this Court is bound to follow and test to employ, and factually, since in that case there were "off-the-record" statements in formal proffer sessions where defense counsel raised the issue of a guideline-sentencing departure under U.S.S.G. § 5K1.1 in exchange for the defendant's cooperation. *Stein*, 2005 WL 1377851 at *14. There was no such plea bargaining in the present matter, and Eleventh Circuit precedent makes such plea bargaining the *sine qua non* of Rule 410 and Rule 11(f) exclusion.

29

*Johnson* similarly is distinguishable.  There, the defendant, through counsel, was contacted by an AUSA, who advised that counsel's client and the company he was associated with were targets of a grand jury securities-fraud investigation; plea negotiations were being conducted with several employees of the company; his client would receive more favorable treatment if he engaged in similar negotiations before the other negotiations were finalized; the discussions with other employees related to pleas to serious felony charges; if the client engaged in negotiations there might be a similar plea offer extended; and the AUSA would like to initiate plea-bargaining negotiations with the client.  The AUSA also advised that in order to engage in plea negotiations, the client would have to meet with the AUSA and law enforcement pursuant to a proffer letter agreement, and the client in fact signed the agreement and met twice with the Government pursuant to that agreement.  The client ultimately was tendered and rejected a plea agreement.  *Johnson*, 534 F. Supp. 2d at 65-66.  The SEC sought to use the earlier statements against the client in a civil enforcement proceeding.  The *Johnson* court ruled that the statements were protected from admission because the Government initiated contact with the client and actively sought his cooperation and the meetings were in the context of broader plea bargaining discussions with company employees.  *Id.* at 67.  It held that the proffer letter was akin to the "off-the-record"

AO 72A
(Rev.8/8
2)

discussions in *Wood*, 879 F.2d at 936, in which the Government was seeking discussions with the client in order to extract information and possibly reach a plea deal. *Johnson*, 534 F. Supp. 2d at 67.  Relying in part on Second Circuit authority like *Velez*, 354 F.3d at 194, which held that ordinarily statements made during plea negotiations, including proffer sessions, are protected, the *Johnson* court recognized that entering into the proffer-letter agreement was a precondition to plea negotiations.  *Johnson*, 534 F. Supp. 2d at 68.  Moreover, the court noted that the AUSA presented the client with a proposed Sentencing Guidelines calculation showing a presumptive prison sentence of twelve years, thus distinguishing the client's case from *Hare*, where Guidelines discussions were discussed only " 'somewhat,' " only in general terms, and not for the purpose of negotiating a plea.  *Id.* (quoting *Hare*, 49 F.3d at 450).  Finally, the *Johnson* court noted that the client was working under a fixed deadline of the impending return of the indictment.  *Id.* at 68-69.  In the present case, there were no discussions about charges, potential Sentencing Guidelines calculations, prison sentences, or deadlines, and most importantly, Morrow's interviews with the AUSA and FBI agents were not presented as a precondition to his ability to even negotiate a plea.  Accordingly, *Johnson* does not compel a different conclusion.

31

The Court also rejects Morrow's argument that the fact that a plea was not discussed does not mean that his statements were not part of a plea negotiation. While it is true that there is no particular verbiage necessary for Rule 410 protections to come into play, as shown, the Eleventh Circuit requires that there be an indication of mutual bargaining for a guilty plea before the rule's exclusionary remedy kicks in. *Robertson*, 582 F.2d at 1369 ("Although we emphasize again that we do not require any formal ritualistic expression of intent to enter plea negotiations on the part of the accused, it is obvious that neither Robertson nor Butigan expressly offered to plead guilty in exchange for a government concession."); *id.* at 1370 ("[T]here is no indication in the record that they were willing to plead guilty to exonerate the women.").

Similarly, the Court rejects Morrow's straw-man argument that a savvy defendant could invoke Rule 410's protections simply by mouthing the word "plea." The Eleventh Circuit cases also require a mutuality of bargaining for a plea and some specific and firm details. *See Merrill*, 685 F.3d at 1013 (finding general discussion about leniency to not constitute plea discussions under Rule 410); *Hogan*, 550 Fed. Appx. at 759 (subjective expectation unreasonable in light of lack of firm plea offer from Government).

32

Even if Morrow had a subjective expectation that he was coming to meetings in Atlanta to engage in plea discussions, his expectations were not objectively reasonable under the totality of the circumstances.   He did not state that he wanted to plead guilty to any charges related to Detroit Memorial Partners or Summit Wealth Management. Moreover, there were no pending charges and no discussions during either meeting about a guilty plea; any promises, vague or specific; leniency for cooperation; Sentencing Guidelines; or deadlines for making a decision.   Thus, this case is similar to *Merrill*, where the Eleventh Circuit found any subjective expectation to be unreasonable because there were no pending charges and any discussions of leniency were general in nature.  *Merrill*, 685 F.3d at 1013.[8]   Here, to the extent that the target letter establishes Morrow's subjective expectation, the short discussion in the letter to the effect that negotiating an early settlement could be potentially beneficial is the type of generalized, nonspecific information about leniency that *Merrill* and *Hogan* deemed insufficient to constitute plea discussions.

_____

[8]      At least in *Merrill*, the discussions about leniency were held during the interview itself.   *Merrill*, 685 F.3d at 1008.   In the present case, there were no discussions at all about leniency, making Morrow's case for reasonableness of his expectation weaker than that in *Merrill*, where the Eleventh Circuit concluded the statements were not made during plea-negotiation discussions.

33

Accordingly, the undersigned concludes that Morrow's statements on August 4, 2014, and November 10, 2015, are not subject to suppression under Fed. R. Crim. P. 11(f) and Fed. R. Evid. 410(a)(4).

**Conclusion**

For all of the above and foregoing reasons, the undersigned **RECOMMENDS** that Morrow's motion to suppress statements, [Doc. 37], be **DENIED**.[9]

───────────────

[9]     Morrow makes no independent argument that his statements were not voluntary.   Even a defendant's non-custodial statements must be voluntarily obtained.   *Dickerson v. United States*, 530 U.S. 428, 434 (2000) (describing due-process underpinnings of voluntariness analysis).   A confession is involuntary and subject to suppression when induced by such duress or coercion, express or implied, that the accused's "will has been overborne and his capacity for self-determination critically impaired."   *Schneckloth v. Bustamonte*, 412 U.S. 218, 225 (1973). The focus of the voluntariness inquiry is on whether the defendant was coerced by the Government into making a statement, that his statement "must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion or deception."   *Colorado v. Connelly*, 479 U.S. 156, 170 (1986) (alteration and internal quotation marks omitted).   The Court should consider the totality of the circumstances in assessing whether any police conduct was "causally related" to the defendant's decision to answer questions or make a statement.   *See Miller v. Dugger*, 838 F.2d 1530, 1536 (11th Cir. 1988).   This totality-of-the-circumstances test directs the Court ultimately to determine whether a defendant's statements were the product of "an essentially free and unconstrained choice."   *United States v. Garcia*, 890 F.2d 355, 360 (11th Cir. 1989).   Among the factors the Court should consider are the defendant's intelligence, the length of his detention, the nature of the interrogation, the use of any physical force against him, or the use of any promises or inducements by police.   *See Schneckloth*, 412 U.S. at 226;

AO 72A
(Rev.8/8
2)

The undersigned has now disposed of all matters referred to Magistrate Judges pursuant to Standing Order 14-02, and has not been advised of any impediment to scheduling a trial.  Accordingly, this case is **CERTIFIED READY FOR TRIAL**.

**IT IS SO RECOMMENDED AND CERTIFIED**, this the  4th   day of November, 2016.

ALAN J. BAVERMAN
UNITED STATES MAGISTRATE JUDGE

---

*United States v. Gonzalez*, 71 F.3d 819, 828 (11th Cir. 1996), *overruled on other grounds by Arizona v. Gant*, 556 U.S. 332 (2009).  However, while the Eleventh Circuit has "enumerated a number of (non-exclusive) factors that may bear on the issue of voluntariness, the absence of official coercion is a *sine qua non* of effective consent . . . ." *Gonzalez, id.* (citations omitted).  Sufficiently coercive conduct normally involves subjecting the accused to an exhaustingly long interrogation, the application of physical force or the threat to do so, or the making of a promise that induces a confession.  *See Connelly*, 479 U.S. at 163 n.1; *Miller*, 838 F.2d at 1536; *United States v. Castaneda-Castaneda*, 729 F.2d 1360, 1362-63 (11th Cir. 1984).  None of those factors is present here, and thus the undersigned also concludes that Morrow's statements were voluntary.

AO 72A
(Rev.8/82)